(1)

FILED
MAILROOM
OCT 26 2026
CLERK, U.S. DISTRICT COURT
ALEXANDRIA, VIRGINIA

UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF VIRGINIA
ALEXANDRIA DIVISION

TONYA D. MCCLEARY,
Plaintiff,

v.

SINCLAIR TELEVISION GROUP, INC.,
Defendant.

Civil Action No. 1:26-cv-3565-RDA-WEF

COMPLAINT FOR EMPLOYMENT DISCRIMINATION,
RETALIATION, AND VIOLATION OF FEDERAL CIVIL RIGHTS LAWS

JURY TRIAL DEMANDED

## I. INTRODUCTION

1. Plaintiff Tonya D. McCleary brings this action against Defendant Sinclair Television Group, Inc. for race and age discrimination, and retaliation arising from her employment in Defendant's Amazing America operation and the related employment decisions described below.

2. Plaintiff seeks relief under Title VII of the Civil Rights Act of 1964, 42 U.S.C. §§ 2000e-2 and 2000e-3; the Age Discrimination in Employment Act (ADEA), 29 U.S.C. §§ 623 and 626; and 42 U.S.C. § 1981.

## II. JURISDICTION AND VENUE

3. This Court has federal-question jurisdiction under 28 U.S.C. § 1331 and jurisdiction under 28 U.S.C. § 1343(a)(4). Plaintiff's Title VII and ADEA claims are also authorized by 42 U.S.C. § 2000e-5(f)(3) and 29 U.S.C. § 626(c), respectively.

4. Venue is proper under 42 U.S.C. § 2000e-5(f)(3) and 28 U.S.C. § 1391 because a substantial part of the employment practices and events at issue occurred in this District, including Plaintiff's work and employment-related meetings in Arlington, Virginia, and the treatment preceding her reassignment and compensation reduction.

5. Defendant employed Plaintiff and conducted the employment activities at issue in this District. The claims arise from those activities, and Defendant is subject to personal jurisdiction here.

## III. PARTIES

6. Plaintiff is an African American woman and a Christian who resides in Oklahoma City, Oklahoma. She was over age 40 throughout the relevant period and age 63 when her employment ended.

7. Defendant Sinclair Television Group, Inc. employed Plaintiff in the Amazing America operation beginning in September 2024 and exercised control over the challenged reassignment, compensation, advancement, and termination decisions. Plaintiff identifies this entity as the respondent named in her EEOC closure correspondence.

## IV. ADMINISTRATIVE PROCEEDINGS AND TIMELINESS

8. Plaintiff filed EEOC Charge No. 570-2025-04287 on August 14, 2025 concerning discrimination and related employment practices arising from her employment with Sinclair.

9. Plaintiff participated in the administrative proceedings and submitted a rebuttal to Defendant's position statement.

10. The EEOC issued a Determination and Notice of Rights on July 30, 2026, stating that it would not proceed further with the investigation and making no determination on the merits. Plaintiff received the notice on July 30, 2026. This action is brought within 90 days of receipt.

## V. FACTUAL ALLEGATIONS

### A. Employment beginning in 2015 and WJLA treatment in 2023–2024

11. Plaintiff has more than three decades of television news, lifestyle programming, production, and management experience. Sinclair initially hired her in December 2015 at its KOKH operation in Oklahoma City.

12. In January 2023, Plaintiff transferred to the WJLA operation in the Washington, D.C./Northern Virginia market, where she served as Lifestyle and Sponsored Content Executive Producer and Executive Producer of Good Morning Washington.

13. Plaintiff's performance history included outstanding evaluations and Employee of the Second Quarter recognition in 2023. Plaintiff was not placed on a performance improvement plan during her employment.

14. At WJLA, Plaintiff's authority was undermined despite her Executive Producer title. Bernstein told her that host Kidd O'Shea was his guy and functioned as a managing editor whose preferences carried substantial weight. Plaintiff was denied an office, restricted from communicating with Sales and Legal, and subjected to criticism in meetings. Her salary was discussed in front of a team member.

15. Plaintiff sought additional staffing as the volume of paid segments increased. She disputed the suggestion that her difficulties reflected inability rather than workload and inadequate support. During her medical absence in late 2023 and early 2024, production, news, and on-air staff provided additional assistance to the show.

16. On December 21, 2023, Plaintiff submitted EEOC Inquiry No. 564-2024-0079 concerning her WJLA treatment, including pay disparity. That inquiry closed without a formal charge. Plaintiff identifies it as background and does not allege that it automatically exhausted separate claims arising from those events.

17. On returning from medical leave in January 2024, Plaintiff was told Rebecca Sinn would provide peer oversight. Plaintiff disputes Defendant's later characterization of this arrangement as a formally communicated structured action plan. She was not advised of or asked to acknowledge such a plan. Sinn is White and was identified by Defendant as age 44.

18. On or about February 23, 2024, Plaintiff submitted an Open Door complaint to Human Resources concerning an October 27, 2023 incident involving Mark Afshar and the conduct of Todd Bernstein. Follow-up discussions occurred on February 29 and March 7, 2024. On March 7, HR Manager Audrey Watson advised that appropriate action had been taken and that retaliation would not be tolerated.

19. Plaintiff raised concerns with HR about race and age bias in hiring, including Bernstein's statement to an internal candidate, Tej Joshi, that the station was looking for someone younger. Plaintiff raised that age-related statement with Bernstein and Watson and contacted Joshi to clarify that it was not her view. Plaintiff preserved a recording and follow-up text concerning the candidate's account.

20. Plaintiff also reported management-treatment concerns to Group Manager Bill Fanshawe, who said he would address them. Plaintiff received no follow-up. She alleges that the earlier complaints and management responses provide context for the later treatment and explain her reluctance to report additional concerns.

21. Plaintiff relies on relevant earlier incidents as background for her timely claims and as evidence of employer knowledge, inconsistent performance explanations, and the treatment of discrimination complaints. She does not allege that every adverse event throughout her employment is timely or that corporate affiliation alone proves a single continuous unlawful practice.

### B. Amazing America assignment in September 2024

22. In September 2024, Plaintiff began serving as Supervising Producer, Food and Travel, for Amazing America, reporting to Nickolas James. Her annual salary was $110,000, with a quarterly performance bonus opportunity of up to $10,000.

23. Plaintiff's responsibilities included influencer recruitment, collaborations, content development and distribution, digital asset training, management, and production. She brought extensive industry relationships and leadership experience to the operation.

### C. Treatment and complaints during early 2025

24. On or about January 8, 2025, Editorial Director Charles Runnette directed Plaintiff to discontinue the relationship with a high-performing African American influencer whose

content had generated approximately 109,000 engagements. He stated that the influencer did not fit the brand and characterized the content as a Barry White imitation.

25. Plaintiff raised concerns about racial bias in the treatment of the influencer and the absence of minority representation in brand audience materials. She reasonably believed that she was opposing racial discrimination.

26. During early 2025, while watching news in his office, Runnette made comments on more than one occasion about far-right Christians who believed that supporting Jewish people would hasten the Second Coming, describing that belief as a fairy tale. Plaintiff responded that she did not agree with those beliefs but was a follower of Christ. The conversations occurred privately. Plaintiff did not report these particular encounters to HR because she feared retaliation based on her prior experience.

27. During early 2025, plaintiff's authority and access to content decisions were restricted despite her experience. She was directed to defer to younger employees and continued to be expected to solve production and content problems. Runnette disparaged the value of her broadcast experience and Murrow Awards and described her as too newsy. She received conflicting directions from Runnette and James about editing, yet was later criticized regarding that work.

28. In spring 2025, Plaintiff requested permission to work remotely from Oklahoma City and proposed continuing her duties while gathering Midwest content. She did not request reduced pay or a demotion.

29. In May 2025, Plaintiff identified and corrected a landing-page error made by a colleague affecting approximately 200 Sinclair stations and acquired additional editing skills. Sinclair subsequently used work she edited. The younger colleague who made the error was not reprimanded.

30. In approximately June 2025, Runnette told Plaintiff to stop commenting like a "62-year-old white woman from the Midwest." Plaintiff was 62 at the time. Runnette was her supervisor, and the statement expressly invoked age and racial identity in criticizing her professional contributions.

### D. July 2025 meeting and Editorial Director application

31. On July 9, 2025, Plaintiff met with Runnette and James in Arlington, Virginia to address the discriminatory treatment she had experienced. Runnette acknowledged making the age-related statement during a recorded portion of the meeting, at approximately timestamp 21:58. Plaintiff preserved the recording. Runnette resigned weeks later.

32. In July 2025, Plaintiff applied for the Editorial Director position associated with Job No. 14970. Plaintiff had not been allowed to lead the team despite holding a Supervising Producer title.

33. In connection with that application, james told Plaintiff that she was not qualified and that team members did not believe she could lead. He identified experience with a national social media handle as a requirement and said she could go through the motions but would not be hired. Plaintiff responded that she had led teams around the country for decades and believed she could lead this team. Plaintiff acknowledged that she had not supervised a national social media handle and agreed a formal interview would not be productive after James stated his requirement. Plaintiff also told him that Runnette had not met that requirement when hired and disputes its consistent application.

34. On July 27, 2025, Plaintiff received a written notice that she had not been selected for the Editorial Director position.

### E. August 2025 demotion announcement and EEOC charge

35. On August 13, 2025, James informed Plaintiff during a Microsoft Teams meeting that her role would change and her salary would be reduced. This announcement followed her complaints about discrimination and the July 9 meeting.

36. James attributed the reduction to cost of living and comparable roles in Oklahoma and Texas in connection with Plaintiff's return to Oklahoma City and remote work. Plaintiff disputes that explanation. Other employees were permitted to work remotely without a pay reduction, and Plaintiff alleges that the stated explanation was applied unequally.

37. On August 14, 2025, Plaintiff filed her EEOC Inquiry. The August 13 announcement preceded that filing; Plaintiff alleges that the announced demotion followed her earlier opposition to discrimination.

## F. October 2025 role change and HR events

38. On or about October 13, 2025, Plaintiff's reassignment to Manager, Sourcing and Distribution, Digital Content became effective. Her salary was reduced from $110,000 to $85,000 per year. Her quarterly bonus opportunity was reduced from up to $10,000 to up to $2,500.

39. Plaintiff lost supervisory authority and responsibilities involving influencer cultivation, content decisions, collaborations, and direct sales-related communications. At the same time, she continued as a station liaison and was assigned or required to learn additional research, analytics, media-monitoring, newsletter, and studio systems, including Google Analytics, Meltwater, Salesforce, and LiveU. Her web-story expectations increased, and she continued responsibility for landing pages across approximately 200 stations. The reduced salary therefore accompanied diminished authority and advancement opportunities, not simply a reduction in all work.

40. During the role transition and afterward, on multiple occasions, James told Plaintiff that he could have eliminated her position. Plaintiff was restricted from communicating directly with influencers she had recruited, required to route team communications through James, directed to remain in the background during certain conversations, and excluded from meetings, chats, and communications needed for her duties.

41. On or about October 15, 2025, Plaintiff participated as a witness in an HR investigation conducted by HR Generalist Carson Bishop into Amber Lipscomb's complaint of bullying by Monti Carlo. Plaintiff reported similar conduct toward Lipscomb's predecessor and explained that she had previously brought concerns to Runnette and James. Plaintiff identifies this as part of the workplace chronology without alleging that every bullying complaint necessarily constitutes protected opposition under federal discrimination law. Plaintiff described the treatment of Lipscomb and her own experiences across the D.C.-area operations and asked for a management investigation; Bishop said she would follow up.

42. On or around October 28, 2025, following a DISC team-building exercise, James publicly accused Plaintiff of reporting the display of employee assessment results to HR and challenged her to report him. Alise Valdes and Sadie Chafe were present. James later told Plaintiff that he believed she had made the report because she had questioned publicly posting the assessments. Plaintiff denied having made that report.

## G. November–December 2025 and subsequent treatment

43. In or about November 2025, Sinclair hired Michaela Pereira into an Executive Producer role without posting or advertising the position or informing Plaintiff and her team that the opportunity existed. Plaintiff would have applied had she been made aware of the opening. Plaintiff alleges that she was denied an opportunity to seek consideration for that role, distinct from her July application and rejection for Editorial Director. Pereira was permitted to work remotely from Los Angeles while periodically visiting the Virginia team. Plaintiff alleges that James told the team Pereira did not have major social media expertise and would rely on the team.

44. On December 17, 2025, Plaintiff met with James and Pereira in Arlington, Virginia and recorded the meeting. James apologized for Runnette's treatment, said he wished he could wipe it away, and said he had not realized how much damage had been done to Plaintiff and others. James also indicated that Runnette's departure followed Plaintiff's allegations. Plaintiff does not characterize those statements as an admission that every alleged action was discriminatory. Later on that same day, during an offsite team holiday gathering, employees were invited to select candles reportedly obtained from a location in Los Angeles. Employees were told that the candles they selected would indicate their future growth.

Plaintiff selected a candle labeled "Healing," a subject she had discussed during an earlier meeting concerning her workplace treatment. At the time, Plaintiff was emotionally overwhelmed and initially welcomed the gift.

Plaintiff subsequently learned that the candle was associated with a ritual requiring the casting of a spell, a practice contrary to her sincerely held Christian religious beliefs.

45. During 2025 and into 2026, Plaintiff received critical emails concerning her Adobe work and writing. James compared her editing unfavorably to her white counterpart in Charleston, who was treated as the senior manager on that team. Plaintiff alleges that her supervisory title did not carry comparable authority.

46. After Plaintiff filed and pursued the EEOC charge, she continued to experience scrutiny, restrictions, and exclusion. Defendant submitted a position statement in the EEOC proceedings. The date Defendant first received the charge and the dates individual decision-makers learned of it are reflected in Defendant's and the EEOC's records.

### H. Compensation, leave, and separation in 2026

47. In 2026, Plaintiff requested a pay increase and met with James and Daniella Williams in HR. HR advised that there were no performance issues on record. James and HR denied the requested increase under a policy concerning fourth-quarter position changes and stated that the denial was not based on performance. James instead offered approximately $3,600 for home-office supplies and equipment, which did not restore her salary.

48. In 2026, Plaintiff took medical leave following a work-related injury and was cleared to return to work with restrictions on June 9, 2026.

49. On June 15, 2026, Defendant informed Plaintiff that her position was eliminated as part of a restructuring or group termination. No work was required after June 15.

50. The group termination affected Amazing America, Entertainment, and Criminally Obsessed functions within the STG DI Hub Content Services Department. Plaintiff was age 63 when selected.

51. On information and belief, the group-termination disclosure provided with the severance offer identified eight employees selected for elimination, five age 50 or older, and twelve employees not selected, three age 50 or older. Plaintiff alleges that the selection pattern, together with the age-related treatment described above, supports an inference of age discrimination. She does not allege that these figures alone conclusively establish discrimination.

52. On June 15, Defendant presented Plaintiff with a proposed Agreement and General Release offering severance consideration in exchange for a release of claims. The

proposal identified EEOC Charge No. 570-2025-04287 and required its withdrawal within five business days of signing, with evidence of withdrawal provided to Defendant.

53. The proposed agreement establishes that Defendant knew of the EEOC charge by June 15, 2026. Plaintiff does not rely on the agreement alone to establish when the termination selection was made or the motive for that selection.

54. Plaintiff did not sign or accept the proposed release on the terms offered and did not withdraw her EEOC charge in exchange for the proposed consideration.

55. Plaintiff's official employment separation date was June 30, 2026.

### I. Resulting harm

56. Plaintiff alleges that Defendant's explanations for the reassignment, reduced compensation, denial of advancement, and termination were pretextual. Her allegations rest on the supervisor's comments, restrictions on her authority, unequal remote-work treatment, pre-determined rejection of her Editorial Director application and lack of notice of the Executive Producer opportunity, performance record, treatment following her opposition to discrimination, and the termination circumstances.

57. The compensation reduction and termination caused lost wages, benefits, retirement contributions, professional opportunities, and emotional distress.

## VI. COUNT I — TITLE VII RACE DISCRIMINATION

58. Plaintiff incorporates paragraphs 1 through 57.

59. Plaintiff is African American and was qualified to perform her work and compete for advancement. Defendant subjected her to reduced duties and compensation, denial of promotional opportunities, and termination.

60. Plaintiff alleges that race was a motivating factor in these employment actions. The facts supporting that inference include racial exclusion in the operation, her supervisor's racially framed comments and influencer directive, and the unequal treatment of Plaintiff's authority, remote-work compensation, and advancement described above.

61. Defendant's conduct violated 42 U.S.C. § 2000e-2(a) and (m), causing economic and non-economic harm.

## VII. COUNT II — TITLE VII RETALIATION

62. Plaintiff incorporates paragraphs 1 through 57.

63. Plaintiff engaged in protected activity by opposing reasonably perceived racial discrimination, raising discrimination concerns at the July 9 meeting, and filing and pursuing her EEOC charge.

64. James knew of Plaintiff's internal discrimination complaints. Defendant also knew of the EEOC proceedings, in which it submitted a position statement; the June 15, 2026 proposal expressly identified her charge.

65. Following Plaintiff's earlier opposition to discrimination, James announced the demotion and compensation reduction on August 13. Following her later protected activity, Plaintiff experienced continued restrictions and exclusion and ultimately termination. Defendant also denied her consideration for advancement as described above. Plaintiff alleges that the challenged actions were materially adverse and could deter a reasonable employee from opposing discrimination.

66. Plaintiff alleges that her protected activity was a but-for cause of the retaliatory actions. She relies on decision-makers' knowledge, the sequence of events, statements concerning HR complaints and position elimination, continuing restrictions, and the disputed explanations for the adverse decisions. Earlier opposition to race discrimination is part of this chronology; complaints limited to age bias, bullying, or general unfairness are not alleged to be independently protected under Title VII merely because they were complaints.

67. Defendant violated 42 U.S.C. § 2000e-3(a), causing Plaintiff economic and non-economic harm.

## VIII. COUNT III — AGE DISCRIMINATION UNDER THE ADEA

68. Plaintiff incorporates paragraphs 1 through 57.

69. Plaintiff was over age 40, was qualified for her position, and had an extensive record of successful performance.

70. Defendant reduced Plaintiff's responsibilities and compensation, denied her advancement opportunities, and selected her for termination. Her supervisor expressly

criticized her by reference to her age, she was directed to defer to younger employees, and the reported group-selection data disproportionately included older employees.

71. Plaintiff alleges that age was a but-for cause of the challenged actions: those actions would not have occurred absent age discrimination. Defendant's purported business explanations were pretextual for the reasons described above.

72. Defendant violated 29 U.S.C. § 623(a). Plaintiff seeks the relief authorized by the ADEA, including liquidated damages if the violation is found willful.

## IX. COUNT IV — SECTION 1981 RACE DISCRIMINATION

73. Plaintiff incorporates paragraphs 1 through 57.

74. Plaintiff's employment relationship constituted a contractual relationship protected by 42 U.S.C. § 1981, including its terms, compensation, advancement, and termination.

75. Defendant intentionally discriminated against Plaintiff because of her race in the employment decisions described above. Plaintiff alleges that her race was a but-for cause of those decisions and the resulting impairment of her contractual employment rights.

76. Defendant violated 42 U.S.C. § 1981, causing economic and non-economic harm.

## X. COUNT V — SECTION 1981 RETALIATION

77. Plaintiff incorporates paragraphs 1 through 57.

78. Plaintiff opposed conduct she reasonably believed involved racial discrimination in employment and reported racial bias within the Amazing America operation. Her supervisors knew of that opposition.

79. Defendant subjected Plaintiff to materially adverse employment actions in retaliation for that race-related opposition, impairing the terms, compensation, advancement, and continuation of her employment relationship.

80. Plaintiff alleges that her race-related protected activity was a but-for cause of the retaliatory actions, based on the management knowledge, sequence, statements, restrictions, and disputed explanations described above.

81. Defendant violated 42 U.S.C. § 1981, causing economic and non-economic harm.

## XI. DAMAGES AND REQUEST FOR RELIEF

82. Plaintiff seeks lost salary and benefits, compensation lost because of the reduced bonus opportunity to the extent proven, retirement contributions, and other economic losses caused by Defendant's conduct. The salary differential before termination was $25,000 on an annualized basis; the actual amount is to be calculated for the affected period.

83. Plaintiff also suffered emotional distress, humiliation, and loss of professional dignity. Plaintiff seeks non-economic damages only under the statutes authorizing them and does not seek duplicate recovery for the same injury.

WHEREFORE, Plaintiff requests that the Court:

A. Enter judgment in Plaintiff's favor;

B. Declare that Defendant violated the applicable statutes alleged above;

C. Award back pay, lost benefits, and other proven economic losses;

D. Award reinstatement or, alternatively, front pay where appropriate;

E. Award compensatory and punitive damages to the extent authorized by Title VII and § 1981;

F. Award ADEA liquidated damages if a willful violation is established;

G. Award prejudgment and post-judgment interest as authorized by law;

H. Award taxable costs and fees or expenses recoverable under applicable law; and

I. Grant any other relief the Court deems just and proper.

## XII. JURY DEMAND

Plaintiff demands a trial by jury on all issues triable by a jury.

Respectfully submitted,

Tonya D. McCleary

TONYA D. MCCLEARY

Plaintiff, Pro Se

1217 NE 20th Street, Oklahoma City, OK 73111

614-806-5857

tonyamccleary@yahoo.com

Date: October 21, 2026

UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF VIRGINIA
ALEXANDRIA DIVISION

__________Tonya D. McCleary____________
Plaintiff(s),

v.

Civil Action Number: 1:26cv3565-RDA-WEF

Sinclair Television Group, Inc. and its subsidiaries and affiliated entities
Defendant(s),

## LOCAL RULE 83.1 (N) CERTIFICATION

**I declare under penalty of perjury that:**

**No attorney has prepared or assisted in the preparation of any forms associated with this filing.**
**(Title of Document)**

Tonya D. McCleary
Name of *Pro Se* Party (Print or Type)

Tonya D. McCleary
Signature of *Pro Se* Party

Executed on: October 21, 2026 (Date)

**OR**

**The following attorney(s) prepared or assisted me in preparation of ________(Title of Document)____________.**

___________________________________
(Name of Attorney)

___________________________________
(Address of Attorney)

___________________________________
(Telephone Number of Attorney)
Prepared, or assisted in the preparation of, this document.

___________________________________
(Name of *Pro Se* Party (Print or Type)

___________________________________
Signature of *Pro Se* Party

Executed on: ________________________(Date)